FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

2010 MAY 19  A 9: 07

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| COMTECH AEROASTRO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:10CV517 |
| | ) | (GBL\JFA) |
| SIERRA NEVADA CORPORATION, | ) | |
| PATRICIA DAVIS REMIAS, and | ) | |
| CRAIG GRAVELLE, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Comes Now the Plaintiff, Comtech AeroAstro, Inc. ("CAA"), by and through its

undersigned counsel, Proskauer Rose LLP, and, for its Complaint against Patricia Remias

("Remias"), Craig Gravelle ("Gravelle"), and Sierra Nevada Corporation ("SNC" and

collectively as "Defendants"), states as follows:

### THE NATURE OF THE CASE AND THE EMERGENT RELIEF SOUGHT

1.     CAA brings this emergency application to protect its confidential and proprietary

information, intellectual property, trade secrets, and other information from the egregious,

ongoing misconduct of Defendant SNC and at least two of SNC's current employees: Patricia

Davis Remias (CAA's former Executive Vice President, Space), and Craig Gravelle (CAA's

former Senior Vice President Business Development).  CAA seeks immediate temporary

restraints and preliminary and permanent injunctive relief to prevent Defendants from gaining an

unlawful competitive advantage over CAA, and compensatory and punitive damages as to all

Defendants.

2.      CAA is engaged in the business of designing, developing, manufacturing and servicing certain types of satellites and high-technology equipment for (among others) the United States Department of Defense.  SNC is one of CAA's competitors for that business.  CAA and SNC are currently engaged in a highly competitive process to obtain a multi-year, multi-million-dollar contract from the United States Air Force for the design and construction of satellites which employ Advanced Plug-n-Play Technologies (the "APT Contract").  Defendants Remias and Gravelle were both key participants in the development of CAA's technology and bid and proposal strategy for the APT Contract, which is currently at a critical phase.

3.      In May 2009, under the guise of negotiating the possible acquisition of CAA, SNC obtained access to confidential information of CAA, including confidential information about key personnel (including Remias and Gravelle), subject to a nondisclosure agreement, which (among other things) prohibited SNC from utilizing or disclosing confidential information or raiding CAA's key employees.  After obtaining this information, SNC dropped its purported interest in the acquisition.  In March and April 2010, SNC hired Remias and Gravelle, the key architects of CAA's bid for the APT Contract, away from CAA.

4.      Despite the knowledge that Remias and Gravelle were contractually barred from working on the APT Contract, SNC assigned them to work on the APT Contract, and Remias and Gravelle performed and are continuing to perform work on the APT Contract for SNC. Thereby, SNC wrongfully and unlawfully obtained and is continuing to obtain the benefit of CAA's confidential information and intellectual property and gain an unfair and unlawful advantage in competing for the APT Contract.

5.      As officers and employees of CAA, Remias and Gravelle were instrumental in driving CAA's satellite systems and technologies business.  Indeed, they developed CAA's

2

comprehensive and detailed strategy for pursuing and obtaining major contracts, which provides CAA with a significant advantage over competitors like SNC. To that end, Remias and Gravelle had complete access to CAA's confidential and proprietary information and trade secrets.

6.     For the past two years, Remias and Gravelle have been integrally involved in preparing, developing, and implementing a business-wide technical, marketing, financial, and business strategy designed to best position CAA to obtain the APT Contract. Through their efforts and recommendations, CAA became almost singularly focused on winning the APT Contract, the end result of which is the anticipated award of a significant initial contract (worth more than $20M) to build the first APT satellite and the anticipated receipt of future awards expected to total $200M.

7.     Remias and Gravelle resigned from CAA within days of one another—and just days after Gravelle attended CAA's Executive Management Team's annual Strategic Planning Meeting—for employment with SNC, a direct competitor with CAA in the satellite systems and technologies industry.

8.     Remias and Gravelle accepted employment with SNC despite the inclusion of non-compete provisions in their respective Employment Agreements with CAA. Based upon their comprehensive knowledge of CAA's confidential and proprietary strategy to obtain the APT Contract and the fact that SNC is directly competing with CAA for the APT Contract, Remias and Gravelle knew or should have known that their work for SNC would breach their post-employment non-compete obligations owed to CAA.

9.     Remias and Gravelle are currently working in substantially the same roles for SNC as they did for CAA and are now known to be intimately involved in SNC's pursuit of the very same APT Contract which they pursued on behalf of CAA—in direct violation of the terms

3

of the fair competition provisions in their respective CAA Employment Agreements *and* despite SNC's written assurance just days ago that the CAA Agreements would be honored.

10.     By happenstance, SNC, Remias, and Gravelle were caught "red handed" on May 5, 2010, when an email sent to a CAA address by mistake revealed that Remias and Gravelle were actively engaged in SNC's efforts to obtain the APT Contract.   In that email, Remias was communicating with Gravelle and other executives in SNC's Space Systems Group to arrange a meeting with the U.S. Air Force's Program Manager for APT.  The meeting is to include a site visit to SNC—with Remias and presumably Gravelle in attendance—on or about May 21, 2010, during which the Air Force is to provide SNC with vital feedback and answer key questions concerning specific task orders of the APT Contract.

11.     A temporary restraining order and preliminary injunction is, therefore, appropriate to immediately enjoin Remias and Gravelle from attending this or future meetings related to the APT Contract; enjoin SNC from engaging Remias and Gravelle in any capacity which competes, directly or indirectly, with CAA, including performing any work or services for SNC concerning the APT Contract or which otherwise violates the terms and conditions of Remias' and Gravelle's Employment Agreements with CAA; and to enjoin SNC from using or relying upon any information received from Remias and Gravelle in any way concerning the APT Contract, including CAA's Confidential Information received from Remias and Gravelle.

12.     By inducing, encouraging, and relying upon Remias' and Gravelle's breaches of their respective Employment Agreements with CAA, SNC has used and continues to use wrongful and unlawful means to gain an unfair competitive advantage in its effort to obtain the APT Contract.  CAA has suffered and will continue to suffer irreparable harm as a result of the unlawful acts of the Defendants.

4

13.     A temporary restraining order and preliminary injunction will maintain the *status quo* and immediately stop Remias, Gravelle, and SNC from, among other things, using unjust and unlawful means and methods to obtain the APT Contract, thereby preventing imminent and irreparable harm to CAA.

14.     CAA further demands compensatory and punitive damages caused by the Defendants' tortious and unlawful conduct.

## THE PARTIES, JURISDICTION, AND VENUE

15.     CAA is a corporation organized and existing under the laws of the State of Delaware. Its corporate headquarters is located at 20145 Ashbrook Place in Ashburn, Virginia.

16.     Patricia Remias (formerly Davis) is believed to currently reside in Colorado. From September 18, 2001 until the effective date of her resignation on April 2, 2010, Remias worked for CAA in Ashburn, Virginia.

17.     Gravelle is believed to reside at 10833 West Ontario Avenue in Littleton, Colorado. From June 15, 2005 until the effective date of his resignation on April 16, 2010, Gravelle spent one week per month on average in Ashburn, Virginia working for CAA and came to Virginia on an as-needed basis.

18.     SNC is a Nevada Corporation with its principal place of business in Sparks, Nevada. SNC maintains an office suite at 11815 Fountain Way, One City Center in Newport News, Virginia and regularly conducts business in Virginia.

19.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1332.

20.     Venue of this action in this Court is proper pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the tortious conduct of Remias and Gravelle occurred in the Commonwealth of Virginia, Remias and Gravelle have caused and are continuing to cause

tortious injury to CAA in the Commonwealth of Virginia, Remias and Gravelle contracted to provide services to CAA in the Commonwealth of Virginia, Remias and Gravelle were regularly present in Virginia to provide those services, and this action arises from the breach of those contracts, which provide that they are to be "governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regard to conflict of laws."

## FACTUAL BACKGROUND AS TO ALL COUNTS

21.     CAA (formerly AeroAstro, Inc.) is in the business of designing and building spacecraft, satellite systems, components, and advanced communications technologies for military, civil, and commercial customers.  Though employing fewer than 75 people, CAA markets its products worldwide.

22.     SNC is a developer and provider of high technology electronics, avionics, and communications systems and is a direct competitor of CAA in the satellite systems and technologies industry.

23.     Remias began working for CAA on or about September 18, 2001 as a Program Director.  In 2005, she was promoted to the position of Vice President and General Manager, Space.  In 2006, Remias was promoted again to the position of Executive Vice President, Space, was an Officer of CAA, and reported directly to the President of CAA.  In these capacities, Remias managed all of CAA's satellite programs, including its contract pursuit strategy, marketing, bids and proposals, and independent research and development.

24.     Gravelle began working for CAA on or about June 15, 2005, as Senior Vice President Business Development, reporting directly to CAA's President and CEO.  In that capacity and as an Officer of CAA, Gravelle was responsible for CAA's contract pursuit strategy, marketing, bids and proposals, and independent research and development.

6

**CAA's Confidential Information and Intellectual Property**

25.     In their senior roles at CAA, Remias and Gravelle had free and unfettered access to CAA's most valuable asset: its Confidential Information and Intellectual Property.

26.     In general, CAA "Confidential Information" to which Remias and Gravelle were privy included information concerning CAA's (i) existing or contemplated products, services, technology, procedures, know-how, designs, processes, algorithms, formulae, research, developments and Intellectual Property; (ii) business plans, sales or marketing methods, methods of doing business, customers, potential customers, suppliers, costs, finances, and pricing policies and information; (iii) information obtained from another party which CAA treats or has agreed to keep as proprietary and confidential; (iv) and information that CAA treats or is obligated to treat as confidential and that is not generally known (including specific customer requirements and information concerning CAA's employees, agents, and/or divisions).

27.     CAA "Intellectual Property" to which Remias and Gravelle had access generally included any computer programs (including source and object codes, flowcharts, algorithms and combinations thereof, routines, subroutines, compilers, assemblers, design concepts, manuals, and related documentation), developments, improvements, discoveries, concepts, ideas, writings, and Confidential Information, whether or not reduced to practice or patentable, that Remias and Gravelle authored, conceived or created, in whole or in part, along or jointly with others, during their employment by CAA, whether during normal work hours or otherwise, which (i) directly relate to CAA's business (including without limitation CAA's present or contemplated products and research) or to tasks assigned to Remias and Gravelle by or on CAA's behalf; or (ii) are written or developed using any CAA equipment, facilities, materials, trade secrets, labor, money, time or other resources.

7

28.     Remias and Gravelle utilized CAA Confidential Information in their involvement in virtually every satellite program offered by CAA.  Specific Confidential Information accessed by Remias and Gravelle included CAA's existing or contemplated:

- Satellites, including the Astro 200 satellite (which capitalizes on excess mass and volume margin as secondary missions and does not require its own expensive launch vehicle) and the Astro 200AS satellite for the U.S. Navy's Joint Milliarcsecond Pathfinder Survey program (which provides highly accurate star position data for military and civil applications);

- Modular satellite design technology, including advanced "plug-n-play" satellite hardware and software development—the enabling technology for spacecraft that can be configured and launched in less than seven days—which is a key goal for successful responsive space operations;

- Research and Development, consisting of significant R&D efforts;

- Business plans and strategies, including detailed plans for the Advanced Spacecraft Vehicle Development, which combines the contract work on Advanced Plug-and-Play Technologies ("APT") Contract task orders, marketing, and internal R&D.

- Sales and marketing methods, including for the APT Contract;

- Potential customers, which largely overlap with those of SNC but also include a group of classified customers.

29.     If Remias and Gravelle are permitted to violate their post-employment non-competition and non-solicitation obligations (described below) with impunity, SNC can and will gain an unfair advantage over CAA in their pursuit of the same contracts and current and potential customers.

## Remias' and Gravelle's Involvement In The APT Contract

30.     Over the past two years, CAA has been developing a comprehensive business, marketing, and research strategy designed to obtain a contract with the U.S. Air Force for Advanced Plug-n-Play Technologies (the "APT Contract").  APT is an indefinite delivery/indefinite quantity contract for the design and development of satellites.  The APT Contract has a ceiling of $200M.

8

31.     In order to focus its resources on the APT Contract, CAA adopted a strategy with concurrence and recommendation of Remias and Gravelle to reduce its efforts on other ongoing satellite Operationally Responsive Space programs and not to pursue other satellite contracts.

32.     Under the direction of Remias and Gravelle, securing the APT Contract became CAA's primary focus for the future of its business operations.

33.     The first task order in the APT Contract process ("APT Task Order 1") called for plug-n-play network architecture design for the satellite infrastructure. Due in large part to the efforts of Remias and Gravelle, CAA was one of six teams to successfully receive an award of APT Task Order 1. This award, received in October 2009 included a $500,000 payment to CAA and the other awardees.

34.     One of the other awardees was SNC.

35.     The second task order in the APT Contract process ("APT Task Order 2") called for standard development support for the plug-n-play for the architecture for the satellite infrastructure. APT Task Order 2 was awarded on May 17, 2010 to each of the six teams which were awarded Task Order 1, including CAA and SNC.

36.     Upon information and belief, the third task order in the APT Contract process ("APT Task Order 3") will be awarded in the coming months to only two contractors. APT Task Order 3 calls for preparation of the network critical design review and development and construction of satellite hardware.

37.     APT Task Order 3 is worth more than $1M to each of the two awardees.

38.     Upon information and belief, the fourth task order in the APT Contract process ("APT Task Order 4") calls for the construction of the first APT spacecraft. APT Task Order 4 is worth more than $20M to the successful firm.

39.     CAA has expended in excess of several hundred thousand dollars pursuing the

APT Contract, and, in particular, the build phase of the APT Contract.

40.     The APT Contract represents a very significant business opportunity for CAA and

is critical to CAA's success.

### Remias' Post-Employment Obligations To CAA

41.     When Remias was hired by CAA, she signed and agreed to be bound by an

Employment Agreement, a true copy of which is annexed hereto as Exhibit 1.  In her Agreement,

Remias understood and agreed among other things that, for a period of two years after the end of

her employment with CAA, she was prohibited from:

> helping in any capacity, another person or entity to research, develop, and/or
> manufacture a product and/or provide a service exactly like or similar to any
> product or service AeroAstro markets as of the date [Remias]'s employment
> terminates.

(Exh. 1, ¶ D. 3).

42.     Remias also agreed that she would not solicit CAA's current or prospective

customers for the purpose of consulting, researching, developing, or manufacturing satellites or

satellite-related components or any other product of services offered for sale by CAA.  (Exh. 1, ¶

D.).

### Gravelle's Post-Employment Obligations To CAA

43.     When Gravelle was hired by CAA, he also signed and agreed to be bound by an

Employment Agreement, a true copy of which is annexed hereto as Exhibit 2.  Gravelle

promised and agreed, among other things, that for one year after the end of his employment with

CAA, he was:

> not to aid or assist any person or entity for the purpose of providing Similar
> Services or Products [defined in the Agreement] that [Gravelle] either worked on,

10

managed or otherwise was associated with or about which [Gravelle] learned Confidential Information during his employment with the Company.

(Exh. 2, at ¶ D. 3).

44.     Gravelle also agreed that, for a period of one year, he would not:

communicate, directly or indirectly, individually or on behalf of any person or entity, with any Customer, Former Customer, or Prospective (during the period of employment) Customer for the purpose of providing Similar Services or Products that Employee either worked on, managed or otherwise was associated with or about which Employee learned Confidential Information during his employment with the Company.

(Exh. 2, ¶ D. 1).

45.     Remias and Gravelle also agreed that they would "maintain in confidence and will not disclose or use directly or indirectly, either during or after the term of this Agreement, any Confidential Information belonging to the Company, whether or not in written form, except to the extent necessary to perform services on behalf of the Company." (Exhs. 1 and 2, ¶ B. 4).

46.     Remias and Gravelle also agreed to be bound by CAA's "Standards of Business Conduct," which required them, among other things, to maintain the confidentiality of CAA's Confidential Information.

47.     Remias and Gravelle received discretionary bonus awards on March 23, 2009. As a condition of receipt their awards, they further acknowledged and agreed, among other things, not to "disclose or use outside of the Company disclose or use outside the Company trade secrets, confidential information or proprietary information relating to the business of the Company or any of its affiliates acquired by me prior to my Termination unless they otherwise become known in the industry." True copies of Remias' and Gravelle's Acknowledgements of the Terms and Conditions for Receipt of their respective Discretionary Bonus Awards are annexed hereto as Exhibits 3 and 4, respectively.

11

48.     In their Acknowledgements, Remias and Gravelle reinforced their non-competition obligations to CAA by agreeing that they would not be involved in:

> the rendering of services, in any geographical area where the Company conducts business, sells product or provide services, for any organization, or engaging, directly or indirectly, in any business, which is competitive with the Company or any of its affiliates, or which organization or business, or the rendering of services to such organization or business, is otherwise prejudicial to or in conflict with the interests of the Company or any of its affiliates.

(Exhs. 3 and 4 at 1-2).

49.     Remias' and Gravelle's non-competition and non-solicitation obligations to CAA are designed to protect the legitimate interests of CAA, impose no undue hardship on Remias or Gravelle, and are consistent with the public policy favoring fair competition and the protection of trade secrets, confidential and proprietary information, and intellectual property.

50.     Indeed, Remias and Gravelle specifically agreed that (i) their post-employment non-compete and non-solicitation restrictions are reasonable as to time, area, and scope to which their activities are to be restricted, (ii) they understand the same and intend to be fully bound with respect thereto, and (iii) such limitations upon their activities for the specified time will not prevent them from earning a reasonable livelihood during their restrictive periods.  (Exh. 1, ¶ D. 3; Exh. 2, ¶ D. 6).

51.     Remias and Gravelle further agreed that CAA "shall be entitled to an injunction" restraining the breach of any of the provisions in their Employment Agreements, "without the necessity of proving monetary damages."  (Exhs. 1 and 2, ¶ E.).

**SNC's Non-Disclosure and Non-Solicitation Agreement With CAA**

52.     On or about May 8, 2009, CAA and SNC entered into a non-disclosure agreement ("NDA") in connection SNC's possible interest in an acquiring CAA.  In connection with the

12

NDA, SNC promised and agreed that it would protect from disclosure and not use any information received from CAA in any manner whatsoever in connection with that process. A true copy of the NDA is annexed hereto as Exhibit 5.

53.     SNC also agreed that, through May 2011, it will not solicit for employment or hire certain employees of CAA. (Exh. 5, ¶8).

54.     SNC acknowledged that CAA could seek specific performance, injunction, or other equitable relief, without proof of monetary damages, in the face of any actual or threatened breach of the NDA. (Exh. 5, ¶10).

**The Resignations Of Remias and Gravelle**

55.     On March 17, 2010, Remias submitted her resignation to AA's President, Paul Lithgow.

56.     CAA's offsite Executive Management Team meeting was set for that day as part of its annual Strategic Planning process (the "Strategic Planning Meeting").

57.     As an Executive Management Team member, Remias was expected to play an integral part in the Strategic Planning Meeting.

58.     In order to further protect CAA's Confidential Information, Mr. Lithgow asked Remias not to attend the Strategic Planning Meeting.

59.     Remias' last day of work for CAA was April 2, 2010.  She subsequently became the Senior Director of Programs for SNC's Space Systems Group.

60.     Gravelle, however, attended the Strategic Planning Meeting held at the Lansdowne Resort in Leesburg, Virginia.

61.     During the Strategic Planning Meeting, and with the full participation of Gravelle, the Executive Management Team freely exchanged detailed information concerning CAA's

current customers and customer relationships, developing technology, short- and long-term future goals and strategic direction, and rolled out its entire business plan for fiscal year 2010 and beyond. A key outcome of this meeting was CAA's strategy for winning the APT Contract.

62.     Gravelle never indicated before attending the March 17 Strategic Planning Meeting that he was considering leaving CAA or accepting employment with any CAA competitor.

63.     Upon information and belief, on or about March 29, 2010, twelve days after he attended the March 17 Strategic Planning Meeting, Gravelle accepted an offer of employment with SNC.

64.     Over the next week, Gravelle continued to report to work for CAA and continued to access CAA's Confidential Information.

65.     Gravelle finally submitted his resignation to CAA on or about April 5, 2010, effective April 16, 2010, which is, upon information and belief, one week after he accepted employment with SNC.

66.     Gravelle subsequently became the Senior Director of Business Development for SNC's Space Systems Group.

67.     Upon information and belief, Remias and Gravelle are working for SNC in substantially the same roles that they held with CAA.

**The Defendants' Unlawful Conduct**

68.     CAA, through counsel, wrote to Remias and Gravelle on April 16, 2010 to advise them of their continuing obligations of confidentiality and non-disclosure and their contractual and other post-employment prohibitions of unfair competition. True copies of these letters are annexed hereto as Exhibits 6 and 7.

14

69. These letters clearly delineated a number of projects which fell within the non-compete and non-solicit provisions of Remias' and Gravelle's Employment Agreements. This list specifically included "Plug n play technology for satellites" (the foundation of the APT Contract) and "APT contract activities to include [Task Order] 2, [Task Order] 3 and beyond planning." (Exh. 7 at 2).

70. On the same day, counsel for CAA also sent a letter to the President of SNC which notified SNC of the terms and conditions of Remias' and Gravelle's Employment Agreements and, in particular, their post-employment confidentiality, non-solicitation, and non-compete provisions. A true copy of this letter is annexed hereto as Exhibit 8.

71. So there would be no confusion, this April 16 letter also notified SNC of the same list of projects which fell within the non-compete provisions of Remias' and Gravelle's Employment Agreements, including "Plug n play technology for satellites" and "APT contract activities to include TO2, TO3 and beyond planning." (Exh. 8 at 3).

72. Three weeks later, SNC acknowledged CAA's letter in a written response dated May 7, 2010, a true copy of which is annexed hereto as Exhibit 9.

73. In its letter, SNC made assurances on behalf of Remias and Gravelle and promised CAA that SNC would:

> remind Ms. Remias and Mr. Gravelle that they may have continuing obligations to Comtech AeroAstro and they should not engage in activities that may violate such obligations or the terms of their employment.

(Exh. 9).

74. However, communications generated weeks *after* CAA's letter to SNC (sent accidentally to Gravelle's CAA e-mail account), contradict SNC's assurances and demonstrate that Remias and Gravelle were and are intimately involved in SNC's efforts to secure the APT

15

Contract for SNC—in direct violation of their post-employment obligations to CAA. Indeed,

they were caught "red-handed."

75. Specifically, on May 4, 2010, U.S. Air Force Captain Carsell A. Milliner,

Program Manager for APT, wrote to Greg Heinsohn (SNC's Director of Satellites) and Jeanette

Arrigo (Avionics Manager at SpaceDev, a wholly owned SNC subsidiary) to arrange for a site

visit with SNC to discuss the APT Contract:

| "Milliner, Carsell A Capt USAF AFMC AFRL/RVEP" <Carsell.Milliner@kirtland.af.mil> 05/04/2010 01:27 PM | To "Greg Heinsohn" <Greg.Heinsohn@sncorp.com> cc "Jeanette Arrigo" <Jeanette.Arrigo@sncorp.com>, "Peck, Neal C Civ USAF AFMC AFRL/RVEP" <neal.peck@kirtland.af.mil>, "Ford, Melody C Civ USAF AFMC AFRL/RVEP" <Melody.Ford@kirtland.af.mil>, "Naff, Jeffrey E Capt USAF AFMC AFRL/RVEP" <Jeffrey.Naff@kirtland.af.mil>, "Bhopale, Apoorva I Civ USAF AFMC AFRL/RVEP" <Apoorva.Bhopale@kirtland.af.mil> Subject feedback session |
|---|---|

```
Greg, the APT team is planning to visit each contractor for a feedback
session on the final reports and to answer any questions on [Task Order]2 and
[Task Order]3.  We're planning SNC visit for May 21. Let me know if this date
is OK. We think 2-3 hours if fine. We can go to Poway or Denver whichever is
best for you.

Capt Carsell A Milliner, USAF

Deputy PM, APT

Kirtland AFB, AFRL/RVE

505-853-7911
```

76. One hour later at 2:30 p.m. on May 4, 2010, Director Heinsohn forwarded

Captain Milliner's e-mail to Remias and suggested that she attend the meeting to meet "the APT

customer" in person:

| Greg Heinsohn/SNC/SNCorp 05/04/2010 02:30 PM | To Pat Remias/SNC/SNCorp@SNCORP cc Jeanette Arrigo/SNC/SNCorp@SNCorp Subject Fw: feedback session |
|---|---|

Pat:

It probably makes sense to do this in Poway since that is where Jeanette's team is. I was also thinking this might be a good opportunity for you to meet the Poway folks as well as the APT customer. Let me know what you think. John and his BD team may also have an opinion. If he feels strongly that his team should attend we may want to do this in Louisville or Littleton. Let me know what you think.

Greg

77.    Rather than immediately take affirmative steps to avoid performing services on

the APT Contract, as required by her CAA Employment Agreement, Remias delivered the e-mail

string from Director Heinsohn and Captain Milliner about the APT Contract meeting and site

visit to John Roth (SNC's Vice President of Business Development, Space Systems Group),

Michael Riesco (SNC's Business Development Manager), and Gravelle for their input in the

process.

78.    Despite SNC's "assurances" that Remias and Gravelle would honor their post-

employments commitments to CAA, Remias' communication with top executives on her SNC

Space Systems team indicates that she and Gravelle are intimately involved with SNC's efforts

to secure the APT Contract:

**From:** Pat Remias [mailto:Pat.Remias@sncorp.com]
**Sent:** Wednesday, May 05, 2010 9:04 AM
**To:** john.roth@sncorp.com; Craig Gravelle; Mike Riesco
**Subject:** Fw: feedback session

John, Mike, Craig,

We've received a message from Capt Milliner at AFRL requesting a meeting on APT on May 21st, see original msg below. They're visiting all the APT contractors to provide feedback on final reports and discuss TO2 and TO3. We're debating where to hold it - here versus in Poway (where most of the technical team is based). I'm assuming that BD will want to attend, and thus Louisville may be the preferred location - we may also want to give them a tour of the facility if that hasn't happened for a while. Let me know your thoughts -
Thanks,
Pat

**Pat Remias**
**Sr. Director of Programs**



Sierra Nevada Corporation
Space Systems Group
1722 Boxelder Street, #102
Louisville, CO 80027
Tel: 720-407-3146
Cell: 303-862-0461
Pat.remias@sncorp.com

79.    Remias' and Gravelle's active involvement in the procurement of the APT

Contract for SNC is virtually identical to their development of the strategy employed by CAA

for its procurement of the very same APT Contract from the same customer.

80.    Remias' and Gravelle's active involvement in the procurement of the APT

Contract for SNC is a direct and unequivocal violation of their ongoing and continuing

obligation to CAA under their respective Employment Agreements.

81.    SNC knew or should have known that Remias and Gravelle were actively

involved in the procurement of the APT Contract for SNC and that such involvement is a direct

violation of their ongoing and continuing obligations to CAA under their respective Employment

Agreements.

82.    Remias, Gravelle, and SNC have acted in bad faith and with malice and have

caused and are continuing to cause CAA irreparable injury.

83.    A temporary restraining order and preliminary injunction is, therefore, warranted

to maintain the *status quo* and prevent imminent and irreparable harm to CAA by immediately

enjoining Remias and Gravelle from working for SNC in any capacity which competes, directly

or indirectly, with CAA and enjoining Remias, Gravelle, and SNC from using unjust and

18

unlawful means and methods to obtain the APT Contract from the U.S. Air Force and from continuing to misappropriate and/or utilize CAA's Confidential Information to gain an unfair competitive advantage over CAA.

## FIRST COUNT

### (Tortious Interference With Prospective Economic Advantage)

84.     CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

85.     CAA has an economic interest in maintaining its competitive economic advantage in the highly competitive satellite systems and technologies industry.

86.     Defendants have and will misuse, exploit, and/or disclose CAA's Confidential Information wrongfully obtained from CAA to gain an unfair competitive advantage for themselves.  This information was not available to SNC or any other CAA competitor or the public at large and Defendants would not have had access to such information but for Remias and Gravelle's employment with CAA.

87.     The afore-alleged acts of Defendants were willful and wanton, accomplished by improper means, and fail to accord with generally accepted business practices and standards of morality.

88.     These acts tortiously interfered with CAA's prospective economic advantage in its efforts to, *inter alia*, obtain the APT Contract without justification or excuse.

89.     The tortious actions of Defendants have enabled them to gain an unfair competitive advantage over CAA which has caused and will continue to cause immediate, continuing, and irreparable harm to CAA.

90. As a direct and proximate result of the direct and/or indirect acts of Defendants, they caused and will continue to cause CAA to suffer irreparable injury if not immediately restrained.

91. CAA, therefore, is entitled to a temporary restraining order and preliminary and permanent injunction prohibiting Defendants' continued tortious conduct; and to judgment against Defendants for compensatory damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other and further relief as the Court deems fair, just, and equitable.

## SECOND COUNT

### (Breach Of Contract – Remias and Gravelle)

92. CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

93. As a condition of Remias' and Gravelle's employment and for good and valuable consideration, they agreed, among other things, that they would not (i) disclose or use CAA's Confidential Information to CAA's detriment, (ii) compete with CAA in a narrow range of activities including, but not limited to, assisting a competitor to procure the APT Contract from the U.S. Air Force, (iii) solicit current and prospective customers of CAA for business, and (iv) solicit CAA employees to leave for another employer.

94. These agreements were supported by fair and adequate consideration and constitute valid, binding, and enforceable obligations between CAA and Remias and Gravelle.

95. These agreements protect the legitimate interests of the CAA, impose no undue hardship on Remias and Gravelle, and are not injurious to the public. All conditions precedent to allowing CAA to enforce the agreement have been performed or have occurred.

96.     By the aforementioned actions and/or omissions, including the involvement of Remias and Gravelle in procuring the APT Contract for SNC and believed solicitation by Gravelle of Remias to leave CAA, Remias and Gravelle breached their agreements with CAA.

97.     A temporary restraining order and preliminary injunction is, therefore, warranted to maintain the *status quo* and prevent imminent and irreparable harm to CAA by immediately enjoining Remias and Gravelle from working for SNC in any capacity which competes, directly or indirectly, with CAA and enjoining Remias, Gravelle, and SNC from using unjust and unlawful means and methods to obtain the APT Contract from the U.S. Air Force and from continuing to misappropriate and/or utilize CAA's Confidential Information to gain an unfair competitive advantage over CAA.

98.     CAA is also entitled to recover damages, including punitive damages, attorneys' fees, and costs, caused by Remias' and Gravelle's breach of contract.

### THIRD COUNT

### (Breach of Fiduciary Duty and Duty of Loyalty – Remias and Gravelle)

99.     CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

100.    By virtue of their positions in CAA management and the confidence and trust imposed by CAA in them, Remias and Gravelle were required to act solely in the interest of CAA, to advance its welfare, to preserve and promote its business opportunities and employee relationships, and not to act contrary to its business interests during their employment with CAA. They had a duty of utmost good faith to CAA and were obligated, among other things, not to interfere with, adversely impact, or harm CAA in any way.

101.    As officers of CAA, Remias and Gravelle owed fiduciary duties to CAA above and beyond their respective duties of loyalty.

102.    The duties owed to CAA by Remias and Gravelle included an express and/or implied duty not to exploit or otherwise make unfair use of their knowledge of CAA's Confidential Information which they obtained and developed by virtue of their trusted positions and relationships with CAA.

103.    By their actions, Remias and Gravelle breached their fiduciary duties and duties of loyalty to CAA.

104.    As a direct and proximate result of Remias and Gravelle's breaches, CAA has been damaged and is entitled to recover damages which include, without limitation, disgorgement of any compensation wrongfully received by Remias and Gravelle during their period of disloyalty.

## FOURTH COUNT

### (Breach Of Contract – SNC)

105.    CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

106.    On or about May 8, 2009, CAA and SNC entered into the NDA with CAA.

107.    For good and valuable consideration, SNC promised and agreed that it would protect from disclosure and not use any information received from CAA in any manner whatsoever.

108.    SNC also agreed that, through May 2011, it will not solicit for employment or hire certain employees of CAA.

109.    The NDA was supported by fair and adequate consideration and constitute valid, binding, and enforceable obligations between SNC and CAA.

110.    The NDA protects the legitimate interests of the CAA, imposes no undue hardship on SNC, and is not injurious to the public.  All conditions precedent to allowing CAA to enforce the NDA have been performed or have occurred.

111.    By the aforementioned actions, including SNC's hire of Remias and Gravelle, SNC breached the NDA with CAA.

112.    CAA is entitled to recover damages, including punitive damages, attorneys' fees, and costs, caused by SNC's breach of contract.

## FIFTH COUNT

### (Misappropriation of Confidential and Proprietary Information)

113.    CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

114.    Upon information and belief, Remias and Gravelle failed to return all CAA Confidential Information taken by them without authorization.

115.    CAA took adequate and reasonable precautions to prevent the theft or misappropriation of its Confidential Information and Remias and Gravelle were never given permission by CAA to remove and/or retain any Confidential Information.

116.    Remias and Gravelle would never have gained access to CAA's Confidential and Proprietary Information without their having been employed at CAA.

117.    CAA's Confidential Information was created for the sole use and benefit of CAA, was kept secure and strictly confidential, was never disclosed to the general public by CAA, and was solely owned, developed, and controlled by CAA.

118.     Upon information and belief, the Confidential and Proprietary Information in Remias and Gravelle's possession rightfully belonging to CAA still has not been returned to CAA.

119.     Defendants have no legal or equitable defense to their possession, exploitation, and misuse of CAA's Confidential Information or Remias' and Gravelle's continued breach of their duty to return all of this information upon termination from CAA.

120.     CAA has been harmed by Remias and Gravelle's actions and is entitled to an order compelling the immediate return of all of its Confidential Information and for judgment against Defendants for compensatory damages; interest; costs of suit; attorney's fees to the extent permitted by law; and such other and further relief as the Court deems fair, just, and equitable.

## SIXTH COUNT

### (Common Law Conspiracy)

121.     CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

122.     Remias and Gravelle were executives and officers of CAA until their respective resignations.

123.     In that capacity, Remias and Gravelle obtained Confidential Information of CAA which they had a duty to safeguard.

124.     SNC knew that Remias and Gravelle had access to Confidential Information of CAA and that they had a duty to safeguard that Confidential Information.

125.     SNC willfully conspired and combined with Remias and Gravelle to induce Remias and Gravelle to breach their duty to safeguard CAA's Confidential Information to injure CAA.

126.     SNC and Remias and Gravelle acted in concert and/or agreed to injure CAA' business intentionally, purposefully, and without lawful justification.

127.     SNC and Remias and Gravelle acted out of an independent personal motive contrary to the interests of CAA.

128.     CAA suffered damages as a result of Sierra Nevada's conspiratorial acts with Gravelle.

## SEVENTH COUNT

### (Business Conspiracy under Virginia Code Annotated § 18.2-499 and § 18.2-500)

129.     CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

130.     SNC, Remias, and Gravelle combined, associated, agreed, and mutually undertook or concerted with each other for the purpose of willfully and maliciously injuring CAA in its reputation, trade, business or profession, without lawful justification.

131.     CAA was damaged in its business as a direct and proximate result of the aforementioned business conspiracy.

## EIGHTH COUNT

### (Unjust Enrichment)

132.     CAA repeats and realleges each of the paragraphs set forth above as if fully set forth herein.

133. Defendants were impermissibly and unfairly enriched by their aforesaid tortious and improper conduct, at CAA's detriment and expense.

134. Equity and good conscience militate against permitting Defendants to retain the benefits of their tortious and improper conduct.

135. By the aforementioned actions and/or omissions, including SNC's involvement of Remias and Gravelle in procuring the APT Contract for SNC, SNC, Remias, and Gravelle will be unjustly enriched at CAA's expense.

136. Defendants' unjust enrichment has caused and continues to cause CAA immediate and irreparable harm which cannot reasonably be quantified in monetary terms.

137. A temporary restraining order and preliminary injunction is, therefore, warranted to maintain the *status quo* and prevent imminent and irreparable harm to CAA by immediately enjoining Remias and Gravelle from working for SNC in any capacity which competes, directly or indirectly, with CAA and enjoining Remias, Gravelle, and SNC from using unjust and unlawful means and methods to obtain the APT Contract from the U.S. Air Force and from continuing to misappropriate and/or utilize CAA's Confidential Information to gain an unfair competitive advantage over CAA.

138. Defendants are also liable to CAA for damages in amounts to be determined by the Court to be just and equitable.

## JURY REQUEST

Plaintiff respectfully requests trial by jury.

**WHEREFORE**, Comtech AeroAstro, Inc. demands temporary restraints and preliminary and permanent injunctive relief against Patricia Remias, Craig Gravelle, and Sierra Nevada Corporation and respectfully requests that the District Court:

1.      Enter a temporary restraining order and/or preliminary injunction against Patricia Remias and Craig Gravelle immediately enjoining them from working at Sierra Nevada Corporation, or at any other competitor of Comtech AeroAstro, Inc., until April 2, 2012 and April 16, 2011, respectively; and

2.      Enter an Order directing Sierra Nevada Corporation to immediately terminate the employment of Patricia Remias and Craig Gravelle or, alternatively, to delay their re-employment to April 2, 2012 and April 16, 2011, respectively; and/or

3.      Enter a temporary restraining order and/or preliminary injunction against Patricia Remias and Craig Gravelle immediately enjoining them from performing any work or services of any type or kind whatsoever for Sierra Nevada Corporation, or any other company, which concerns, relates to, or involves in any way the following services or products:

- APT Contract activities, including Task Order 2, Task Order 3, and beyond planning;
- Plug-n-play technology for satellites;
- Operationally Responsive Space;
- LEO comm system for disadvantaged users;
- JMAPS and other missions it enables;
- DARPA F-6 Program;
- GEOST Program;
- SEM Program;
- SSAEM Program;
- Coral and Pearl cubesats pursuits;
- Colony II bus bid and AI&T Program;

27

- Collaboration with universities such as TAMU and SDL; and
- Classified Opportunities: Tuscany, Sierra Leone, Patagonia, Yukon, Carlos, and Kalahari; and

4.      Enter a temporary restraining order and/or preliminary injunction against Sierra Nevada Corporation immediately enjoining it from permitting Patricia Remias and Craig Gravelle from performing any and all services, assistance, and/or work of any type, kind, or nature whatsoever, directly or through others, which concerns, relates to, or involves in any way the above referenced services or products; and

5.      Enter an Order directing Patricia Remias, Craig Gravelle, and Sierra Nevada Corporation to provide a complete accounting of any and all services, assistance, and/or work of any type, kind, or nature whatsoever which they performed, directly or through others, which concerns, relates to, or involves in any way the above referenced services or products; and

6.      Enter a temporary restraining order and/or preliminary injunction against Patricia Remias and Craig Gravelle immediately enjoining them from: violating any other material term or condition of their Employment Agreements with Comtech AeroAstro, Inc.; disclosing or using Comtech AeroAstro, Inc.'s Confidential Information (as defined in the Employment Agreements) in any manner; and otherwise breaching their continuing fiduciary duties and duties of good faith and fair dealing owed to Comtech AeroAstro, Inc.; and

7.      Enter an Order requiring Patricia Remias, Craig Gravelle, and Sierra Nevada Corporation to immediately return to Comtech AeroAstro, Inc. all Comtech AeroAstro, Inc. property in their possession including, but not limited to, the original and all copies of all Confidential Information (as defined in the Employment Agreements) in their possession, custody, or control.

**AND FURTHER WHEREFORE**, Comtech AeroAstro, Inc. respectfully requests that the Court:

1.      Grant Comtech AeroAstro, Inc. final judgment against Defendants for all actual, compensatory, and punitive damages, as well as other damages to be determined at trial, together with pre-judgment and post-judgment interest.

2.      Grant Comtech AeroAstro, Inc. final judgment against Defendants for all allowable costs, attorneys' fees, and other litigation expenses to the extent recoverable under the respective Employment Agreements and applicable law.

3.      Grant Comtech AeroAstro, Inc. such other and further relief that the Court deems may be just, equitable, and proper.

Dated: Washington, D.C.
       May 18, 2010

                              Respectfully submitted,

                              PROSKAUER ROSE LLP

By:                              
                              Todd Castleton, Esq.
                              Virginia Bar #40237
                              1001 Pennsylvania Avenue, NW
                              Suite 400 South
                              Washington, DC 20004
                               tcastleton@proskauer.com
                              T: 202.416.6800
                              F: 202.416.6899
                              Counsel for Plaintiff
                              *Comtech AeroAstro, Inc.*

                              and

                              John P. Barry, Esq.
                              Mark A. Saloman, Esq.
                              PROSKAUER ROSE LLP
                              One Newark Center
                              18th Floor

Newark, New Jersey 07102
  jbarry@proskauer.com
  msaloman@proskauer.com
T: 973.274.3200
F: 973.274.3299

Of Counsel for Plaintiff
*Comtech AeroAstro, Inc.*

6473/21989-001 Current/18992402v7